UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X

BRIAN HOPKINS, LIANA HOPKINS, and
SEAN HOPKINS,

                        Plaintiffs,

      -against-

NATIONAL RAILROAD PASSENGER
CORPORATION a/k/a AMTRAK and
MASSACHUSETTS BAY TRANSPORTATION
AUTHORITY,

                       Defendants.

------------------------------------------------------------------------X

**MEMORANDUM & ORDER**

**08-CV-2965 (NGG) (RML)**

NICHOLAS G. GARAUFIS, United States District Judge.

Before the court are the parties' respective pre-trial motions in limine. (See Pls.' Mot. in Lim. to Preclude Electric Chair Evidence (Dkt. 81); (Pls.' Mot. in Lim. to Preclude Various Hearsay Items (Dkt. 82); Pls.' Mot. in Lim. to Exclude Evidence of Brian Hopkins's Comparative Negligence (Dkt. 83); Not. of Defs.' Omnibus Mot. in Lim. (Dkt. 84); Pls.' Mot. in Lim. to Exclude Evidence Concerning Brian Hopkins's Knowledge of Electrical Danger (Dkt. 87); Pls.' Mot. in Lim. to Preclude State Case Pleadings (Dkt. 88); Pls.' Mot. in Lim. to Exclude Evidence of Brian Hopkins's Drinking and Marijuana Use (Dkt. 89); Pls.' Mot. in Lim. to Exclude Text Messages and Phone Records (Dkt. 90); Defs.' Mot. in Lim. to Preclude Testimony of Michael Morse from the Liability Phase of Trial (Dkt. 99).)

For the reasons stated below, the court holds as follows:

- Plaintiffs' motion to preclude electric chair evidence (Dkt. 81) is GRANTED. (See infra Part III.A.3.)

- The court RESERVES ruling on Plaintiffs' motion to preclude various hearsay items (Dkt. 82). (See infra Part III.A.2.)

1

- Plaintiffs' motion to exclude evidence of Brian Hopkins's comparative negligence (Dkt. 83) is GRANTED in part and DENIED in part. (See infra Part III.A.1.ii.a.)

- Defendants' omnibus motion (Dkt. 84) is GRANTED in part, DENIED in part, and RESERVED in part. (See infra Part III.B.)

- Plaintiffs' motion to exclude evidence concerning Brian Hopkins's knowledge of electrical danger (Dkt. 87) is DENIED. (See infra Part III.A.1.ii.b.)

- Plaintiffs' motion to preclude state case pleadings (Dkt. 88) is GRANTED. (See infra Part III.A.4.)

- Plaintiffs' motion to exclude evidence of Brian Hopkins's drinking and marijuana use (Dkt. 89) is GRANTED in part and DENIED in part. (See infra Part III.A.1.ii.c.)

- Plaintiffs' motion to exclude text messages and phone records (Dkt. 90) is DENIED. (See infra Part III.A.1.ii.d.)

- Defendants' motion to preclude testimony of Michael Morse from the liability phase of trial (Dkt. 99) is DENIED. (See infra Part III.B.9.)

## I.  BACKGROUND

The court assumes familiarity with the underlying facts, but will briefly describe the facts that are relevant to these motions. The court refers to its Summary Judgment Decision for additional factual background. (See Summ. J. Mem. & Order ("Summary Judgment Decision") (Dkt. 58) at 1-6.)

In the early morning of July 9, 2006, Plaintiff Brian Hopkins[1] was extremely intoxicated. (Id. at 2, 3.) At approximately 4:00 a.m., Hopkins climbed on top of a train parked at South Station in Boston. (Id. at 2.) Although witnesses saw Hopkins in South Station, no witness saw Hopkins climb on top of the train. (Id. at 3.) Hopkins himself has no memory of the events of the night. (Id.) While on top of the train, Hopkins came into contact with an electrified catenary

---

[1] The court will refer to Brian Hopkins as Hopkins.

wire, resulting in a severe shock. (Id.) The train upon which Hopkins was found was not scheduled to leave the station until the early afternoon. (Id. at 4.)

South Station is operated by the Massachusetts Bay Transportation Authority ("MBTA"), although the National Railroad Passenger Corp. ("Amtrak") energizes and operates the electric rails that run through the station. (Id. at 3.) It is Amtrak operating procedure to leave catenary wires energized at all times unless work requires the power to be turned off. (Id. at 4.) Accordingly, Amtrak regularly trains its workers regarding catenary wire safety. (Id.) South Station is patrolled by Amtrak police officers at various times but there is no officer specifically assigned to the station. (Id.)

## II.    LEGAL STANDARD

### A.    Motion in Limine

"The purpose of a motion in limine is to allow the trial court to rule in advance of trial on the admissibility and relevance of certain forecasted evidence." Gorbea v. Verizon N.Y., Inc., No. 11-CV-3758 (KAM), 2014 WL 2916964, at *1 (E.D.N.Y. June 25, 2014) (citing Luce v. United States, 469 U.S. 38, 40 n.2 (1984); Palmieri v. Defaria, 88 F.3d 136, 141 (2d Cir. 1996); Nat'l Union Fire Ins. Co. of Pittsburgh v. L.E. Myers Co. Grp., 937 F. Supp. 276, 283 (S.D.N.Y. 1996)). "Evidence should be excluded on a motion in limine only when the evidence is clearly inadmissible on all potential grounds." United States v. Paredes, 176 F. Supp. 2d 179, 181 (S.D.N.Y. 2001). "[C]ourts considering a motion in limine may reserve decision until trial, so that the motion is placed in the appropriate factual context." Jean-Laurent v. Hennessy, 840 F. Supp. 2d 529, 536 (E.D.N.Y. 2011) (citing Nat'l Union Fire Ins. Co., 937 F. Supp. at 287). Further, a district court's ruling on a motion in limine is preliminary and "subject to change when the case unfolds." Luce, 469 U.S. at 41.

## B.    General Rules of Admissibility

Federal Rule of Evidence 402 provides that "[r]elevant evidence is admissible unless any

of the following provides otherwise: the United States Constitution; a federal statute; these rules;

or other rules prescribed by the Supreme Court. Irrelevant evidence is not admissible." Fed. R.

Evid. 402. Thus, "unless an exception applies, all '[r]elevant evidence is admissible.'" United

States v. White, 692 F.3d 235, 246 (2d Cir. 2012) (quoting Fed. R. Evid. 402). Rule 401

provides that "[e]vidence is relevant if: (a) it has any tendency to make a fact more or less

probable than it would be without the evidence; and (b) the fact is of consequence in determining

the action." Fed. R. Evid. 401. The Second Circuit has characterized this relevance standard as

"very low." See White, 692 F.3d at 246 (quoting United States v. Al-Moayad, 545 F.3d 139, 176

(2d Cir. 2008)). Indeed, "[t]o be relevant, evidence need not be sufficient by itself to prove a fact

in issue, much less to prove it beyond a reasonable doubt." United States v. Abu-Jihaad, 630

F.3d 102, 132 (2d Cir. 2010).

Under Federal Rule of Evidence 403, "[t]he court may exclude relevant evidence if its

probative value is substantially outweighed by a danger of one or more of the following: unfair

prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly

presenting cumulative evidence." Fed. R. Evid. 403. "[W]hat counts as the Rule 403 'probative

value' of an item of evidence, as distinct from its Rule 401 'relevance,' may be calculated by

comparing evidentiary alternatives." Old Chief v. United States, 519 U.S. 172, 184 (1997). In

short, Rule 403 requires "the district court [to] make a conscientious assessment of whether

unfair prejudice substantially outweighs probative value" with regard to each piece of proffered

evidence. Al-Moayad, 545 F.3d at 160 (quoting United States v. Salameh, 152 F.3d 88, 110

(2d Cir. 1998) (per curium)).

4

## III.   DISCUSSION

### A.   Plaintiffs' Motions

#### 1.   Evidence of Hopkins's Alleged Recklessness

Plaintiffs have filed a number of motions seeking to exclude from trial evidence relating to Hopkins's conduct and state of mind on the night of the incident. (See Pls.' Mot. in Lim. to Exclude Evidence of Brian Hopkins's Comparative Negligence ("Comparative Negligence Motion") (Dkt. 83); Pls.' Mot. in Lim. to Exclude Evidence Concerning Brian Hopkins's Knowledge of Electrical Danger ("Electrical Danger Motion") (Dkt. 87); Pls.' Mot. in Lim. to Exclude Evidence of Brian Hopkins's Drinking and Marijuana Use ("Past Alcohol Use Motion") (Dkt. 89); Pls.' Mot. in Lim. to Exclude Text Messages and Phone Records ("Text Messages and Phone Records Motion") (Dkt. 90).) Broadly, Plaintiffs argue in each motion that evidence of Hopkins's conduct and state of mind is not relevant, because Massachusetts law does not provide for a comparative recklessness defense. (See, e.g., Comparative Negligence Motion at 2 ("[T]here is no concept of comparative recklessness under Massachusetts Law.").) Plaintiffs further argue that, under Massachusetts law, Defendants are barred from arguing that Hopkins's recklessness was the sole proximate cause of his injuries. (Id. at 3-5.) Accordingly, Plaintiffs contend that evidence concerning Hopkins's actions and thoughts on the night of the accident are simply irrelevant.[2]

Defendants disagree. They argue that Hopkins's actions and state of mind on the night of the accident are relevant for three purposes. First, Defendants argue that a plaintiff's recklessness is a bar to recovery under Massachusetts law. (See Defs.' Opp'n to Pls.' Mots. in Lim. ("Defs.' Opp'n") (Dkt. 97) at 4-7.) Second, Defendants argue that Hopkins's evidence of

---

[2] Plaintiffs also have a number of more specific objections to certain categories of evidence. The court discusses those objections below.

recklessness is relevant to show that Hopkins recklessness was the sole proximate cause of his injuries. (Id. at 7-8.) Third, Defendants argue that Hopkins's state of mind is relevant to show that the overhead wire was an open and obvious danger, and, therefore, no warning was required. (Id. at 8-9.)

The court largely agrees with Defendants. For the reasons explained below, evidence of Hopkins's conduct and state of mind on the night of the incident is relevant to show (1) Hopkins's recklessness, (2) Hopkins's role in causing the incident, and (3) the obviousness of the danger of the live catenary wire. (See infra Parts III.A.i.a-c.) However, certain proffered evidence is nonetheless inadmissible because it is unduly prejudicial. (See infra Part III.A.ii.)

      i.      Legal Principles

            a.      Recklessness as a Bar to Recovery under Massachusetts Law

Plaintiffs argue that "there is no concept of comparative recklessness under Massachusetts Law." (Comparative Negligence Motion at 2.)[3] Defendants disagree; they contend that "[a] plaintiff whose conduct is in reckless disregard of his own safety is barred from recovery against a defendant whose reckless disregard of the plaintiff's safety is a legal cause of the plaintiff's harm." (Defs.' Opp'n at 4 (quoting Restatement (Second) of Torts §§ 482(2), 503(3) (1965)).) If Plaintiffs are correct, then evidence showing that Hopkins was reckless would be irrelevant and therefore inadmissible. On the other hand, if Defendants are correct, then evidence showing that Hopkins was reckless is relevant to prove a valid defense.

---

[3] Plaintiffs frame much of their argument in terms of Hopkins's negligence. (See Comparative Negligence Motion at 1-2.) They are correct that Hopkins's negligence is not a defense to Defendants' alleged recklessness. Zeroulias v. Hamilton Am. Legion Assocs., Inc., 705 N.E.2d 1164, 1166 (Mass. App. Ct. 1999) ("The comparative negligence statute does not apply to intentional or wilful, wanton, or reckless conduct."). Nonetheless, the same evidence may (and often does) implicate both negligence and recklessness. (Daubert Decision (Dkt. 73) at 19-20 (explaining how Massachusetts courts use the same evidence to examine both negligence and recklessness).)

This is not an easy question.[4] Neither party cites any Massachusetts law in support of

their position. Indeed, Defendants acknowledge that "[n]o Massachusetts court has formally

adopted (or rejected) Restatement Section 503(3) [on contributory recklessness]." (Id. at 4 n.3.)

Moreover, nationally, "[t]he courts that have confronted [this] issue have split on the outcome,

some holding that recklessness is a bar to recovery under comparative fault and some, perhaps a

small majority, holding that it is not." Jim Hasenfus, The Role of Recklessness in American

Systems of Comparative Fault, 43 Ohio St. L.J. 399, 401 (1982). Nonetheless, the court

concludes that generally, under Massachusetts law, a plaintiff's reckless conduct will bar

recovery against a reckless defendant.[5]

At common law, a plaintiff's recklessness generally was a complete bar to recovery

against a reckless defendant. Restatement (Second) of Torts §§ 482(2), 503(3); Restatement

(First) of Torts § 482 (1934) ("In order that the plaintiff's conduct may bar him from recovery, it

is necessary that he not only know of the defendant's reckless conduct but also realize the gravity

of the risk involved therein so that he is not only unreasonable but reckless in exposing himself

to it."); W. Page Keeton et al., Prosser & Keeton on Torts 462 (5th ed. 1984). Massachusetts

followed the common law rules. See, e.g., Pridgen v. Boston Housing Auth., 308

N.E.2d 467, 473 (Mass. 1974) (citing Sections 500-503 of the Restatement (Second)); Aiken v.

Holyoke St. Ry. Co., 68 N.E. 238, 240 (Mass. 1903) ("There are expressions in some of the

---

[4] Indeed, the court reserved ruling on this question at the Summary Judgment phase. (See Summary Judgment Decision at 16 ("Defendants' authority concerning the state of comparative negligence and a plaintiff's criminal conduct as a bar to recovery address only claims of negligence. Defendants do not provide any Massachusetts law for the proposition that these rules apply in the recklessness context, and the court is aware of no such authority. The court cannot, without more, extend principles governing recovery in negligence to apply to Plaintiffs' claims of recklessness." (internal citations omitted).)

[5] The common law had a number of rules that mitigated the harshness of the contributory negligence and contributory recklessness doctrines by allowing negligent or reckless plaintiffs to recover in certain situations. For example, the last clear chance doctrine allowed a negligent plaintiff to recover despite his own negligence where the defendant had the last clear chance to prevent the harm. (See Restatement (Second) of Tort § 480 (1965)).

cases which imply the possibility of contributory negligence on the part of the plaintiff in a case of a wanton and reckless injury by a defendant. If there is a conceivable case in which a plaintiff's want of due care may directly and proximately contribute as a cause of an injury inflicted directly and proximately by the willful wrong of another, such a want of care must be something different from the mere want of ordinary care to avoid an injury coming in a usual way."). Thus, to accept Plaintiffs' position, the court would have to conclude that Massachusetts departed from the common law either by statute or by subsequent court decision.

i.      Statute

Plaintiffs' basis for believing that there is no comparative recklessness defense (and presumably no contributory recklessness defense either) is unclear because Plaintiffs' argument on the issue consists of a single clause without citation. (See, e.g., Comparative Negligence Motion at 2.) Nonetheless, it is possible that Plaintiffs believe that because the Massachusetts legislature abolished contributory negligence, the defense of contributory recklessness was impliedly abolished as well.

Like most states, Massachusetts has statutorily eliminated the common law contributory negligence rule. Massachusetts General Law, Chapter 231, Section 85 ("Section 85") provides:

> Contributory negligence shall not bar recovery in any action by any person or legal representative to recover damages for negligence resulting in death or in injury to person or property, if such negligence was not greater than the total amount of negligence attributable to the person or persons against whom recovery is sought, but any damages allowed shall be diminished in proportion to the amount of negligence attributable to the person for whose injury, damage or death recovery is made. . . .
>
> The defense of assumption of risk is hereby abolished in all actions hereunder.
>
> The burden of alleging and proving negligence which serves to diminish a plaintiff's damages or bar recovery under this section

8

> shall be upon the person who seeks to establish such negligence, and the plaintiff shall be presumed to have been in the exercise of due care.

Mass. Gen. Laws Ann. ch. 231, § 85. Section 85 says nothing about contributory recklessness. Indeed, Massachusetts courts interpreting Section 85 have made clear that "[t]he comparative negligence statute is not applicable to intentional or wilful, wanton, or reckless conduct." Boyd v. Nat'l R.R. Passenger Corp., 845 N.E.2d 356, 364 (Mass. 2006); see also Zeroulias, 705 N.E.2d 1164, 1166 (Mass. App. Ct. 1999) ("The comparative negligence statute does not apply to intentional or wilful, wanton, or reckless conduct."); cf. Flood v. Southland Corp., 616 N.E.2d 1068, 1072 (Mass. 1993) ("The strong majority view across the country is that comparative fault statutes do not apply to intentional tort claims, with exceptions arising especially where the statute uses terms broader than negligence, such as 'culpable conduct' or 'fault.'").

Moreover, basic principles of statutory interpretation counsel against reading Section 85 to apply to recklessness. First, the plain text of the statute says nothing about recklessness. "Our starting point in statutory interpretation is the statute's plain meaning, if it has one." United States v. Dauray, 215 F.3d 257, 260 (2d Cir. 2000); see also Boston Police Patrolmen's Ass'n v. City of Boston, 761 N.E.2d 479, 480 (Mass. 2002) ("As always, we interpret the statutory language according to the intent of the Legislature ascertained from all its words construed by the ordinary and approved usage of the language, considered in connection with the cause of its enactment, the mischief or imperfection to be remedied and the main object to be accomplished, to the end that the purpose of its framers may be effectuated." (internal citations and quotation marks omitted)). It would defy plain meaning to read the Massachusetts Legislature's reference to "negligence" to include recklessness. This is especially true because Massachusetts law draws

a clear distinction between the two concepts. See Montes v. Mass. Bay Transp. Auth., 843

N.E.2d 611, 615 (Mass. 2006). "Reckless conduct involves a degree of risk and the voluntary

taking of that risk that is so great that, compared with negligent conduct, the difference is not

merely one of degree but of kind." In fact, Massachusetts courts have "been careful to preserve

the distinction between negligence and gross negligence, on the one hand, and wanton or

reckless conduct on the other." Boyd, 845 N.E.2d at 364 (citing Commonwealth v.

Welansky, 55 N.E.2d 902, 911 (Mass. 1944)).

Second, because legislatures are presumed to legislate against the backdrop of the

common law, courts will not interpret statutes to abrogate the common law unless the intent to

do so is clear. See, e.g., United States v. Texas, 507 U.S. 529, 534 (1993); United States v.

Federative Republic of Brazil, 748 F. 3d 86, 96 (2d Cir. 2014); Commonwealth v. George W.

Prescott Pub. Co., LLC, 973 N.E.2d 667, 675 (Mass. 2012); Riley v. Davison Constr. Co., 409

N.E.2d 1279, 1283 (Mass. 1980). Here, the Massachusetts Legislature evidenced no intent to

change the common law rules concerning a reckless plaintiff.

Accordingly, the court concludes that Section 85 does not abridge the common law rules

concerning contributory recklessness.

### ii. Case Law

It appears that no Massachusetts case has explicitly addressed whether contributory

recklessness remains the law. (Defs.' Opp'n at 4 n.3.) See also Hasenfus, supra, at 399

(surveying state practice). However, the court concludes that it likely does remain good law for

five reasons.

First, although the issue has not been squarely decided, Massachusetts courts have

indicated that contributory recklessness remains Massachusetts law. Following the enactment of

Section 85, the Supreme Judicial Court approvingly cited Sections 500 to 503 of the Restatement

(Second). See Pridgen, 308 N.E.2d at 473. Importantly, Section 503(3) codifies the contributory

recklessness rule. See Restatement (Second) of Torts § 503(3) (1965). The court recognizes that

Pridgen's endorsement of Section 503(3) is weak. Contributory recklessness was not at issue

there and the Pridgen court refers to the entire Restatement chapter on recklessness. However,

given the dearth of Massachusetts case law in this area, the court believes that Massachusetts

would likely follow the path set by Pridgen if the issue were to squarely arise.

Second, Massachusetts's approach to cases where a plaintiff's criminal conduct causes

his or her own harm suggests that a plaintiff's own recklessness remains a bar to recovery. In

Ryan v. Hughes-Ortiz, 959 N.E.2d 1000 (Mass. Ct. App. 2012), the plaintiff stole the

defendant's gun and then accidentally shot himself. Id. at 1004. The appeals court held that

Massachusetts's public policy precluded recovery because the plaintiff had stolen the gun at

issue. Id. Critically, in support of its decision, the court cited Restatement (Second)

Section 889, Comment b. Id. at 1005. Comment b provides in relevant part that "[c]riminal

conduct that by virtue of statutory interpretation or otherwise constitutes negligence or

recklessness, is a defense to an action for harm caused by corresponding negligence or

recklessness of another, under the rules stated with reference to contributory negligence and

contributory recklessness in §§ 463- 484 and 502 and 503." Restatement (Second) of

Torts § 889, cmt. b (1979).[6] Thus, Comment b is simply a specific application of the

---

[6] Section 85 provides that "[t]he violation of a criminal statute, ordinance or regulation by a plaintiff which contributed to said injury, death or damage, shall be considered as evidence of negligence of that plaintiff, but the violation of said statute, ordinance or regulation shall not as a matter of law and for that reason alone, serve to bar a plaintiff from recovery." Mass. Gen. Laws Ann. ch. 231, § 85. However, that statement has been interpreted to "nevertheless allow[] for exceptions where, . . . the decision to bar the cause of action is based not only on the plaintiff's violation of a criminal statute, but also on public policy considerations." Ryan, 959 N.E.2d at 1004; see also Flanagan v. Baker, 621 N.E.2d 1190, 1193 (Mass. App. Ct. 1993) ("[W]e think § 85 could also be construed as allowing for some exceptions. It reasonably could be argued that, by using the words 'as a matter of law and for that reason alone,' the Legislature intended that a lawbreaker could be barred from recovery where reasons in addition to

contributory recklessness rule in the context of criminal conduct. Accordingly, because Comment b reflects the law in Massachusetts, the court believes that contributory recklessness likely remains the law as well. The court recognizes that this result is not necessarily the case. For example, Section 85 eliminated the general contributory negligence rule but did not eliminate the specific rule articulated in Section 889 as it related to negligent criminal conduct. Ryan, 959 N.E.2d at 1004. Accordingly, Plaintiffs could argue that despite the continued viability of Comment b, the general contributory recklessness rule has been abolished. Nonetheless, the court believes that because contributory recklessness survives in Massachusetts, specifically where the plaintiff engages in criminal conduct, it more likely than not survives generally as well, especially absent contrary evidence of specific legislative intent.

Third, Massachusetts's approach to cases where the plaintiff is negligent but the defendant is reckless indicates that recklessness remains a bar to recovery. At common law, a reckless defendant could not benefit from a plaintiff's negligence. See Restatement (Second) of Torts § 503(1); Potter v. Gilmore, 184 N.E. 373, 376 (Mass. 1933) ("And negligence of a plaintiff is not a bar to recovery for injury caused by the defendant's wilful, wanton or reckless conduct."). Massachusetts courts continue to apply this rule. See Lane v. Meserve, 482 N.E.2d 530, 532 n.6 (Mass. Ct. App. 1985) ("The judge was correct in instructing the jury that they were not to take Lane's negligence into account if they found employees of the defendant had engaged in wilful or wanton misconduct."). The fact that Massachusetts continues to follow the common law with regard to some principles of allocation of fault among reckless parties

---

the criminality of the conduct exist, such as public policy considerations. If § 85 is read in this manner, purpose is given to those words, which might otherwise be surplusage. A burglar who breaks his leg while descending the cellar stairs, due to the failure of the owner to replace a missing step, could be denied recovery for public policy considerations." (internal quotation marks and citation omitted)).

suggests that Massachusetts likely continues to follow the common law contributory recklessness rule.

Fourth, Massachusetts's continued application of traditional contributory rules in the context of intentional torts supports the court's conclusion that contributory recklessness remains Massachusetts law. In the context of intentional torts, Massachusetts courts have rejected the application of comparative fault. Flood, 616 N.E.2d at 1071 ("If a defendant's misconduct was intentional, that misconduct is not involved in the application of § 85."); Aiken, 68 N.E. at 239 ("In an action to recover damages for an assault and battery it would be illogical and absurd to allow as a defense proof that the plaintiff did not use proper care to avert the blow."). Massachusetts has traditionally treated recklessness as more similar to intentional acts than to negligence. See, e.g., Sandler v. Commonwealth, 644 N.E.2d 641, 643 (Mass. 1995) ("According to our cases, the degree of risk that will warrant a finding of reckless conduct can involve an imputation of intentional conduct to a person who in fact did not realize the gravity of the danger."); Aiken, 68 N.E. at 239 ("In these cases of personal injury there is a constructive intention as to the consequences, which, entering into the willful, intentional act, the law imputes to the offender, and in this way a charge which otherwise would be mere negligence becomes, by reason of a reckless disregard of probable consequences, a willful wrong."). Thus, because Massachusetts treats recklessness as more similar to intentionality, the court believes that Massachusetts is unlikely to have abandoned the contributory recklessness defense.

Finally, Plaintiffs' proposed rule has no support in the history of tort law. Under Plaintiffs' reading of Massachusetts law, a plaintiff who alleges that a defendant was reckless can completely bar an inquiry into their own conduct. This has never been the case. Indeed, neither the common law contributory rules nor modern comparative regimes completely insulate

13

a plaintiff's conduct from any inquiry where the plaintiff and the defendant are alleged to have engaged in the same quantum of behavior (i.e. negligent plaintiff vs. negligent defendant or reckless plaintiff vs. reckless defendant). See, e.g., Restatement (Third) of Torts: Apportionment Liab. §§ 3, 7 (2000) (providing for apportionment of harm between mutually reckless parties); Restatement (Second) of Torts § 503(3) (providing that a plaintiff's recklessness bars recover against a reckless defendant)). In fact, the only time that a plaintiff's conduct is insulated from inquiry is when the defendant is alleged to have engaged in a more egregious type of conduct than the plaintiff (i.e. negligent plaintiff vs. reckless defendant or negligent plaintiff vs. intentional defendant). See, e.g., Restatement (Second) of Torts § 503(1). Yet, Plaintiffs' proposed rule would allow for no inquiry at all into a plaintiff's behavior, even in a case where both sides allege the same quantum of behavior; there is no support for such a rule.

Thus, the court concludes that generally a plaintiff's own recklessness remains a bar to recovery under Massachusetts law. Accordingly, the Defendants are permitted to introduce evidence tending to show that Hopkins engaged in reckless conduct, which caused his own injury.

     b.  Sole Proximate Cause

In addition, Defendants argue that Hopkins's conduct on the night in question is relevant because "[h]is claim may also fail if the jury finds that his conduct was unforeseeable and a sole or superseding proximate cause of his injuries." (Defs.' Opp'n at 4.) Defendants are correct. "Under Massachusetts law, a superseding intervening cause can, as a matter of law, constitute the sole proximate cause where the intervening events have broken the chain of factual causation or, if not, have otherwise extinguished the element of proximate cause and become a superseding

cause of the harm." White v. Raytheon Co., No. 07-CV-10222 (RGS), 2008 WL 5273290, at *4 n.5 (D. Mass. Dec. 17, 2008) (internal citations and quotation marks omitted).

Plaintiffs' arguments to the contrary are unavailing. Plaintiffs first argue that because they must show that Defendants' conduct was a proximate cause of Hopkins's injuries to recover there is no reason for Defendants to introduce evidence of other potential causes. (Comparative Negligence Mem. at 3-4.) Apparently, Plaintiffs believe that, because if they prove their affirmative case they will have demonstrated proximate cause, there is no reason for Defendants to raise alternative causes. (Id. at 4.) The court disagrees. "It is elemental that a plaintiff may recover from a defendant in negligence only if he proves that the defendant's breach of a duty of care owed to the plaintiff proximately caused the plaintiff's injuries. It is equally elemental that the defendant may seek to avoid liability by offering evidence tending to disprove the existence of any duty, breach, cause, or injury." Correia v. Firestone Tire & Rubber Co., 446 N.E.2d 1033, 1038 (Mass. 1983). Thus, "the general rule [is] that a defendant's demonstration that the sole proximate cause of an injury lies elsewhere is a defense against negligence claims." Allen v. Chance Mfg. Co., 873 F.2d 465, 471 (1st Cir. 1989). The reason for this rule is that to prove a negligence claim, a plaintiff must show that the defendant's actions were the proximate cause of plaintiff's injury. See Colter v. Barber-Green Co., 525 N.E.2d 1305, 1313 (Mass. 1998) (distinguishing the elements of a negligence claim from a breach of warranty claim). If the defendant can show that some other actor is the sole proximate cause of plaintiff's injury, plaintiff's claim necessarily fails. Allen, 873 F.2d at 471 (noting that a finding that the sole proximate cause defense did not apply to negligence causes would be "intuitively implausible"). Accordingly, Massachusetts courts routinely dismiss negligence actions when a defendant can show that the plaintiff's injuries were caused entirely by some other actor. See, e.g., Brillante v.

15

United States, 449 F. Supp. 597, 600 (D. Mass. 1978) ("I rule that defendant has sustained the burden of showing by a preponderance of the evidence that plaintiff's injury was proximately caused by his own negligence and that moreover plaintiff's negligence was the sole proximate cause of the accident."); cf. Boston & M. R. R. v. Meech, 156 F.2d 109, 111-12 (1st Cir. 1946) ("Also we think it evident from what we have said that although the decedent could readily have taken more care than he did for his own safety . . . still we cannot say that as a matter of law his carelessness was the sole proximate cause of the accident.").

Massachusetts courts apply the same logic to recklessness claims because recklessness also requires a showing of causation. See Malaquias v. Borges, No. 20071849B, 2010 WL 1077083, at *4 (Mass. Super. Ct. Feb. 16, 2010) (discussing causation in the context of a recklessness claim); Spagnulo v. Com., Dep't of Envtl. Mgmt., No. 2003191, 2006 WL 1238671, at *5 (Mass. Super. Ct. Mar. 15, 2006) ("[M]any variables exist in the nexus between failure to take precautions and the plaintiff's injury. Passage of time, obviousness of the danger, the chances of this type of specific types of injury occurring, and intervening/supervening causes between the actor's conduct and the injury, deem it a rare case where failure to take precautions results in a recklessness finding." (emphasis added)). Indeed, Massachusetts courts consider whether other actors, including the plaintiff, caused their own harm when assessing causation in the context of recklessness. See Ali v. City of Boston, 804 N.E.2d 927, 932 (Mass. 2004) ("Therefore, we cannot say that the city acted recklessly in expecting that the public would take particular care in navigating after dark on roads in a park that, as the plaintiff well knew, contained traffic gates."); Siver v. Atl. Union Coll., 154 N.E.2d 360, 364 (Mass. 1958) ("The accident to the child was caused not by improper construction or location of the pit but by the removal of the cover by some third person."). Plaintiffs' argument boils down to the position

16

that they should be allowed to prove their case, but that Defendants should be forbidden form proving their defense. This cannot be.

Plaintiffs also contend that the sole proximate cause theory is largely a creature of products liability law. (Comparative Negligence Mem. at 4-5.) Plaintiffs' second argument adds nothing. Plaintiffs are correct that usually the sole proximate cause defense has been employed in the context of products liability. (See Comparative Negligence Mem. at 4-5.) But, the mere fact that the sole proximate cause defense is most commonly used in the context of products liability says nothing about whether the defense is available here. In fact, as explained above, Massachusetts courts allow a reckless defendant to argue that another actor caused the plaintiff's injury. Indeed, Plaintiffs themselves have taken the position that Defendants' sole proximate cause theory should be presented to the jury. (Pls.' Opp'n to Defs' Mot. for Summ. J. (Dkt. 48) at 24-25 (arguing that a jury should decide whether Hopkins's injuries were solely caused by his own conduct).

Therefore, the court concludes that the sole proximate cause defense is a valid defense to Plaintiffs' claims.

c.    Open and Obvious Danger

Finally, Defendants argue that evidence of Hopkins's knowledge of the danger of electrical wires is relevant to whether Defendants had a duty to warn. (Defs.' Opp'n at 8.) Defendants are correct. Under Massachusetts law, "Landowners are relieved of the duty to warn of open and obvious dangers on their premises because it is not reasonably foreseeable that a visitor exercising (as the law presumes) reasonable care for his own safety would suffer injury from such blatant hazards." O'Sullivan v. Shaw, 726 N.E.2d 951, 954-55 (Mass. 2000). This principle applies with equal force to recklessness claims. See Beausoleil v. Mass. Bay Transp.

Auth., 138 F. Supp. 2d 189, 207 (D. Mass.); Shattuck v. Trs. of Boston Univ., No. 03635, 2010 WL 3232296, at *2 (Mass. Super. Ct. Aug. 3, 2010). Thus, evidence of Hopkins's knowledge of the risks posed by electrical wires is relevant to whether Defendants recklessly failed to warn Hopkins of the risk posed by catenary wires. This evidence is in turn relevant because Plaintiffs allege that Defendants recklessly failed to post warnings about the risk posed by the catenary wire. (Summary Judgment Decision at 21 ("According to Plaintiffs, Defendants were reckless because they left the train at the station under the catenary wire all night; they failed to turn off the electricity to the catenary wire though it was possible to do so; they failed to secure the track area; and they failed to issue any warnings with respect to the catenary wire.").)

### ii.     Application

Having concluded that Hopkins's state of mind and conduct on the night of the accident are relevant, the court must examine the specific evidence that Defendants proffer to determine if it is admissible.

### a.     Hopkins's Prior Conduct on the Night of the Accident

Defendants wish to introduce evidence showing that on the night of the accident Hopkins (1) consumed large amounts of alcohol, (2) urinated in public despite his friends warning him that doing so was illegal, (3) snuck past security to enter a bar, and (4) stormed out of his friend's apartment in anger close to 4:00 a.m. with no place to go and over the objections of his friend.[7] (Defs.' Opp'n at 9.) Defendants argue that this evidence has two purposes. First, they contend that each proffered fact tends to make it more likely that Hopkins recklessly caused his own

---

[7] Defendants also wish to introduce other facts regarding Hopkins conduct on the night in question. (Defs.' Opp'n at 9.) The court defers ruling on whether these facts would be admissible. Without knowing what other evidence Defendants wish to introduce, the court cannot decide if the evidence is admissible.

injury. (Id.) Second, they argue that each fact makes it more likely that Hopkins would have ignored or evaded the safety measures that Plaintiffs suggest were required. (Id.)

Each purpose is relevant. As explained above, evidence that tends to show that Hopkins recklessly endangered his own safety is relevant. Likewise, evidence concerning whether additional safety measures would have been effective is relevant to breach and causation. See Boyd, 845 N.E.2d at 364 (noting that to succeed on a recklessness claim a plaintiff must show that the defendant created an unreasonable risk).

Plaintiffs argue that even if each purpose is theoretically relevant, they are not relevant here because "nobody knows the reason Brian Hopkins ascended the train." (Comparative Negligence Mot. at 3.) Plaintiffs' argument is baffling. Defendants are permitted to introduce evidence that "has any tendency to make a fact more or less probable than it would be without the evidence" so long as "the fact is of consequence." Fed. R. Evid. 401. Hopkins purpose for climbing the train is relevant to a recklessness analysis. See Montes, 843 N .E.2d at 615 (noting that reckless conduct involves the voluntary taking of a grave risk). Likewise, whether—given Hopkins's mental and physical states—additional security measures could have prevented the injury is relevant to, among other things, assessing breach and causation. True, the evidence that Defendants have proffered regarding Hopkins's mental and physical state is not open and shut, but it need not be under the Federal Rules. Thus, the court finds that evidence which tends to show why Hopkins would have climbed the train or whether additional security measures would have been effective is relevant.

i.      Hopkins's Drunkenness

Hopkins's drunkenness is relevant to both his own recklessness and the likelihood that additional security measures would have been effective. Neither party contests that drunkenness

19

is relevant to this litigation. Indeed, the parties have stipulated that Hopkins had a blood alcohol level of 2544 mg/L immediately following his electric shock. (Comparative Negligence Mem. at 2.)

Plaintiffs appear to argue that evidence of Hopkins's drunkenness should be excluded under Rule 403 because it is unduly prejudicial and cumulative. (Id. at 1-3.) The court disagrees.

First, evidence of Hopkins's drunkenness is not unfairly prejudicial. Admitting evidence that directly relates to Hopkins's recklessness on that night is not unfair. See Highland Capital Mgmt., L.P. v. Schneider, 551 F. Supp. 2d 173, 176-77 (S.D.N.Y. 2008) ("Evidence is prejudicial under Rule 403 if it 'involves some adverse effect beyond tending to prove the fact or issue that justified its admission into evidence.'" (alteration removed) (quoting United States v. Gelzer, 50 F.3d 1133, 1139 (2d Cir 1995)). Put another way, Defendants are not seeking to unfairly suggest that Hopkins was likely to be reckless by attacking his general character; instead, Defendants seek to introduce evidence about what specific acts Hopkins took on the night of the accident in order to show that those specific acts were reckless. The court sees no reason why this use of evidence is unfair.

Second, evidence of Hopkins's drunkenness is not cumulative. "Evidence is cumulative when it replicates other admitted evidence." United States v. Jamil, 707 F.2d 638, 643 (2d Cir. 1983). Plaintiffs argue that evidence of Hopkins's drunkenness is cumulative because the parties have stipulated that Hopkins climbed on top of the train and that he had an alcohol level of 2544 mg/L immediately following his electric shock. (Comparative Negligence Mem. at 2.) Defendants respond that "[w]ithout the proper context [the alcohol level] figure is meaningless to the jury." (Defs.' Opp'n at 11.) The court agrees with Defendants. Parties are

20

usually free to add relevant color in place of stipulated facts because "[a] syllogism is not a story, and a naked proposition in a courtroom may be no match for the robust evidence that would be used to prove it." Old Chief v. United States, 519 U.S. 172, 189 (1997). This concern is particularly acute here, where the court believes that the stipulation does not provide the jury much information at all. It seems highly unlikely that a juror will understand what an alcohol level of 2544 mg/L means. Instead, evidence of Hopkins's drinking and behavior are much more likely to provide the jury context concerning Hopkins's actions and state of mind at the time of the accident. Plaintiffs are certainly right that there is some limit to the amount of drunkenness testimony that can be put on—this is, after all, not a trial about how drunk Hopkins was—but the court cannot say precisely where that line is until Defendants begin to elicit testimony. Nonetheless, the line certainly extends beyond the parties' stipulation.

Thus, the court concludes that evidence concerning Hopkins drunkenness is admissible.

### ii.    Public Urination

Defendants argue that Hopkins's urination in an alley, following his friends warning him that doing so was unlawful, is probative to whether Hopkins was likely to take risks or whether Hopkins was likely to heed warnings. (Defs.' Opp'n at 9.) The court finds both propositions dubious. First, because public urination and climbing on top of a train present different types of risk, evidence that an individual took the former risk offers very little evidence about their mental state with regard to the latter. The risks associated with public urination are quite different from the risks associated with climbing on top of a train. Public urination risks criminal enforcement. See Commonwealth v. McGillivary, 967 N.E.2d 651 (Mass. App. Ct. 2012) (table) (noting that the Defendant had been arrested for open and gross lewdness following his public urination). Importantly, unlike climbing on top of a train, public urination generally does not

21

risk physical harm. Second, verbal warnings from a friend concerning public urination differ considerably from posted warnings of electrical danger. Accordingly, the court finds that, to the extent it is relevant at all, evidence of Hopkins's public urination is minimally relevant.

By comparison, evidence of public urination is likely prejudicial. See, e.g., United States v. Honken, 378 F. Supp. 2d 970, 985 (N.D. Iowa 2004) (The unfair prejudice from this evidence, as the government suggests, is that the jury will make a determination of [the witness's] credibility on the improper, emotional basis of a reaction to the nature of his instances of indecent exposure."); McGillivary, 967 N.E.2d at 651 ("The judge concluded that counsel had not been ineffective because this evidence [of an arrest for public urination] would have gravely prejudiced the defendant.").

Accordingly, the court finds that evidence of Hopkins's public urination is inadmissible.

### iii. Sneaking into a Bar

Defendants argue that Hopkins's sneaking past security to enter a bar, is probative to whether Hopkins would likely have been affected by additional security at the train station. (Defs.' Opp'n at 9.)[8] The court agrees, the fact that Hopkins avoided security guards on the night of the accident loudly speaks to what his likely mental state would have been had he confronted a security guard at South Station. That is, there is sufficient similarity between the mental state associated with avoiding a security guard at a bar and the mental state associated with avoiding a security guard at a train station that the former provides circumstantial evidence of the latter. Thus, the court concludes that evidence that Hopkins snuck into a bar is relevant.

---

[8] Evidence that Hopkins snuck past a security guard is not admissible as direct evidence that Hopkins was likely to engage in reckless conduct. Much like with public urination, the risks associated with sneaking into a bar are so different from the risks associated with climbing on top of a train, that the evidence is not relevant.

However, because there is a permissible purpose for its use, the evidence is admissible. If Plaintiffs request it, the court will consider a limiting instruction.

Moreover, evidence that Hopkins snuck into a bar is not unfairly prejudicial. Indeed, Plaintiffs have not even suggested why evidence that Hopkins snuck into a bar would be prejudicial.

Likewise, because of the similarity between avoiding a security guard at a bar and avoiding a security guard at a train station, the sneaking into a bar evidence does not pose a Rule 404 problem. Rule 404(b)(2) permits prior crimes, wrongs, or acts to be admitted to show "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2). Here, where the allegedly wrongful prior act (sneaking past a guard) occurred on the same night as the accident and involved the same means (avoiding security), the court believes that the permissible uses of the evidence strongly outweigh any prejudice.

Accordingly, the court concludes that evidence regarding Hopkins avoiding security at a bar on the night of the accident is admissible.[9]

### iv. Storming Out of Friend's House

Finally, Defendants seek to admit evidence that on the morning of the accident Hopkins stormed out of his friend's home at 4 a.m., over the pleas and objections of his friends.[10] (Defs.' Opp'n at 9.) This evidence is highly relevant. It is nearly contemporaneous evidence concerning Hopkins's motive and state of mind immediately before he climbed on top of the train. It thus

---

[9] The court further finds that the sneaking-into-a-bar-evidence is critically different from the public-urination-evidence in two ways. First, security guards at a bar are unlikely to be materially different from security guards at a train station. Unlike the difference between a verbal warning from a friend and a posted warning, the mechanism by which security guards interdict wrongful conduct is likely to be similar. Thus, the sneaking-into-a-bar-evidence is more probative. Second, evidence that Hopkins snuck into a bar is less prejudicial. The court believes that a jury is more likely to have a direct adverse reaction to evidence that Hopkins urinated in public than to evidence that Hopkins snuck past a security guard at a bar (that he could have legally entered anyway).

[10] The text messages from Peter Arhangelsky and Hopkins's phone records may be some of the evidence that could be offered on this point. The court addresses the admissibility of those pieces of evidence below. (See infra Part III.A.1.ii.d.)

speaks strongly to whether Hopkins was reckless and whether Hopkins could have been dissuaded from climbing the train. That is, upon hearing evidence that Hopkins stormed out of his friend's house, in the early morning, with nowhere to go, just before the incident occurred, the jury could infer that Hopkins's was mentally set on engaging in risky behavior.

Moreover, evidence that Hopkins left his friend's house at 4 a.m. is not unfairly prejudicial. "Rule 403 is for weeding out 'unfair' prejudice—prejudice not related to the actual merits of the case in suit." U.S. Bank Nat. Ass'n v. PHL Variable Life Ins. Co., 112 F. Supp. 3d 122, 155 (S.D.N.Y. 2015). As explained above, evidence of Hopkins's mental state when he was at the train station is critical to two questions at issue in the case, namely, whether Hopkins acted recklessly when he climbed the train and whether additional security measures could have prevented the accident. Thus, evidence closely connected to Hopkins mental state is not unfairly prejudicial. Moreover, the jury will inevitably—and rightfully, under the Rules of Evidence—learn that Hopkins drunkenly climbed on top of a train. Evidence of how Hopkins got to the train station in the first place is no more prejudicial than evidence of Hopkins's actions at the train station. Accordingly, the court concludes that the probative value of evidence that on the morning of the accident Hopkins stormed out of his friend's home at 4 a.m., over the pleas and objections of his friends outweighs any prejudicial effect; the evidence is admissible.

b.    Hopkins's Knowledge of Electrical Hazards

Plaintiffs argue that evidence concerning Hopkins general knowledge of electrical hazards should be excluded. (See generally Electrical Danger Motion.) Plaintiffs argue that because the court found in the Summary Judgment Decision that most other incidents of electric shocks occurring on top of trains were inadmissible to show Defendants' notice (see Summary

Judgement Decision at 18-21), evidence of Hopkins's knowledge of the dangers of electricity must also be inadmissible (Electrical Danger Motion at 1-2).[11] The court disagrees.

The basis for excluding prior instances of electric shocks does not apply to evidence of Hopkins's knowledge of electrical risks. At the summary judgment phase, Plaintiffs pointed to prior incidents where individuals had climbed on top of trains and came into contact with electrified wires as evidence "that Defendants had notice of the danger posed by parking trains under electrified catenary wires." (Summary Judgement Decision at 18.) As the court explained in its Summary Judgment Decision although, "evidence of prior accidents is admissible to show a defendant's knowledge of a dangerous condition, . . . basic principles of relevancy require that the other instances of injuries received should have occurred under substantially similar circumstances." (Summary Judgement Decision at 19 (internal quotation marks and citation omitted).) However, Defendants do not seek to introduce prior accidents to show that Hopkins had notice that the catenary wire was dangerous. Instead, Defendants seek to introduce direct evidence that Hopkins was aware of the risks posed by electrical wires.

Direct evidence that a plaintiff understood the risks associated with his actions does not implicate the same prejudice concerns as using unrelated accidents to prove notice. The reason that the use of prior accidents to show notice is limited is because "the jury might infer from evidence of the prior accident alone that ultra-hazardous conditions existed at the site and were the cause of the later accident without those issues ever having been proved." Edwards v. Consol. Rail Corp., 567 F. Supp. 1087, 1106 (D.D.C. 1983), aff'd, 733 F.2d 966 (D.C. Cir. 1984) (quoting Gardner v. S. Railway Sys., 675 F.2d 949, 952 (7th Cir. 1982)). That concern is not implicated by evidence that a plaintiff understood the specific risks associated with his behavior.

---

[11] Plaintiffs also argue that evidence of Hopkins's knowledge of electrical dangers is irrelevant because Hopkins's recklessness is not a defense. The court has rejected this argument above.

Direct evidence that a plaintiff understood the danger associated with his conduct allows a jury to infer that a plaintiff knowingly confronted the specific danger that caused the specific harm at issue in the case. Thus, unlike the use of prior accidents to prove notice, direct evidence of a plaintiff's knowledge of the specific risk at issue does not introduce unrelated evidence into the case from which the jury could draw impermissible inferences.

Thus, the court concludes that evidence that Hopkins's understood the risks associated with electrical wires is admissible.

c. Hopkins's Prior Instances of Drinking and Marijuana Use

Plaintiffs argue that evidence concerning Hopkins's general drinking and marijuana usage on days other than the day of the accident should be excluded. (See generally Past Alcohol Use Motion) Plaintiffs argue that such evidence is (1) impermissible character evidence under Rule 404(a), (2) irrelevant because the parties have stipulated to Hopkins's blood alcohol level at the time of the accident, and (3) more prejudicial than probative. The court agrees with respect to evidence of marijuana use, but disagrees with respect to evidence concerning Hopkins's past drinking.[12]

First, under Rule 404(a)(1), "[e]vidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait." Fed. R. Evid. 404(a)(1). Thus, for example, it would be impermissible for Defendants to argue that because Hopkins had been drunk in the past he was likely drunk on the night of the accident. However, evidence of past crimes, wrongs, or other acts is admissible "so

---

[12] Defendants do not contest that evidence of marijuana use is inadmissible. (Defs.' Opp'n at 1 n.1.) The court agrees that such evidence is not admissible. No party alleges that Hopkins used marijuana on the night of the accident or that marijuana played any role in causing Hopkins's injuries. Thus, Hopkins past use of the drug is irrelevant.

long as [it is] not offered to show the defendant's propensity to commit the offense." United States v. Curley, 639 F.3d 50, 57 (2d Cir. 2011). Accordingly, Rule 404(b) allows other acts evidence to show "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2). Evidence of Hopkins's past drinking is relevant for these permitted uses. For example, Defendants intend to offer evidence that Hopkins had previously acted dangerously when he consumed alcohol. (Defs.' Opp'n at 14.) This evidence may be relevant to show that Hopkins understood the risks associated with his drinking, which is relevant to showing recklessness. See Montes, 843 N.E.2d at 615 (noting that reckless conduct involves the voluntary taking of a grave risk).[13]

Second, the parties' stipulation concerning Hopkins's blood alcohol level does not render evidence concerning Hopkins's past drinking irrelevant. The parties' stipulation provides that Hopkins had an alcohol level of 2544 mg/L immediately following his electric shock. (Comparative Negligence Motion at 2.) However, Defendants are not seeking to use evidence of Hopkins's past drinking to show that he was likely drunk on the night in question. Instead, they intend to introduce evidence of Hopkins's past drinking to show that he understood the risks associated with his use of alcohol. (Defs.' Opp'n at 14.) The stipulation says nothing about Hopkins's knowledge and thus does not make the proffered past-drinking-evidence irrelevant or cumulative.

---

[13] Defendants argue that they may be able to show that Hopkins had a pattern of behaving recklessly when he became drunk. (Defs.' Opp'n at 14.) "Evidence of a person's habit or an organization's routine practice may be admitted to prove that on a particular occasion the person or organization acted in accordance with the habit or routine practice." Fed. R. Evid. 406. Defendants have only proffered one instance where Hopkins arguably behaved recklessly while intoxicated. A single episode is insufficient to show a habit. See Corona v. Adriatic Italian Rest. & Pizzeria, No. 08-CV-5399 (KNF), 2010 WL 675700, at *1 (S.D.N.Y. Feb. 23, 2010) ("[A] party seeking to establish a practice has become its habit must show its practice was employed on occasions numerous enough to allow an inference to be drawn that its practice is systematic conduct."). Thus, at this point, the court cannot conclude that evidence of Hopkins's prior drinking is admissible as habit evidence. In any event, Defendants appear to largely conflate their habit arguments under Rule 406 with their knowledge and intent arguments under Rule 404(b). (See Defs.' Opp'n at 14.) Nonetheless, if Defendants wish to pursue their habit argument, they must make an additional supporting proffer.

Finally, evidence of Hopkins's past drinking is not unfairly prejudicial. The question of whether Hopkins understood the risks associated with his behavior is relevant to determining whether he recklessly caused his own injury. It therefore is not unfair for Defendants to admit evidence tending to show that Hopkins had reason to know how he was likely to behave while intoxicated. Highland Capital Mgmt., L.P., 551 F. Supp. 2d at 176-77 ("Evidence is prejudicial under Rule 403 if it 'involves some adverse effect beyond tending to prove the fact or issue that justified its admission into evidence.'" (alteration removed) (quoting Gelzer, 50 F.3d at 1139). Moreover, the jury will no doubt be told that Hopkins was extremely drunk at the time of the accident. Evidence that Hopkins had been drunk before is no more prejudicial than evidence that will already be admitted.

Accordingly, the court finds that evidence of Hopkins's prior drinking is admissible.

### d. Text Messages and Phone Records

Plaintiffs seek to exclude text messages from Peter Arhangelsky to Brian Hopkins and Brian Hopkins's cell phone records from the night before and morning of the accident. (See generally Text Messages and Phone Records Motion.) Specifically, Plaintiffs wish to exclude two text massages. The first text message was sent from Arhangelsky to Hopkins after Hopkins had left Arhangelsky's home to go to the train station; the text message reads "F—k you. S—k you own c—k. I hope your bus goes down. I sat at South Station for two hours." (Id. at 1.) The second text message asks Hopkins to call Arhangelsky so that "I know you're alive." (Id.) There is no evidence that Hopkins read either message. (Id.) Plaintiffs argue that the text messages and other phone records are inadmissible because (1) they are irrelevant because evidence of Hopkins's state of mind and conduct are not relevant, (2) they are inadmissible hearsay, (3) they do not assist the jury in understanding why Hopkins was on the train in light of

the parties' stipulations, and (4) the text messages are more prejudicial than probative. None of these arguments are compelling.

First, Hopkins's state of mind and conduct on the night of the accident are relevant. (See supra Part III.A.1.i.) Moreover, the text messages and phone records are relevant to show Hopkins's state of mind. Arhangelsky witnessed Hopkins immediately before Hopkins went to the train station. Arhangelsky's text messages therefore offer a window into how Arhangelsky perceived Hopkins's actions and thought processes immediately before the incident occurred. In the text messages, Arhangelsky expresses anger and worry that Hopkins left Arhangelsky's house to go to the bus station. From these messages, the jury could infer that Arhangelsky perceived that Hopkins was acting erratically or dangerously, and from there could infer that Hopkins was actually acting dangerously. These inferences can be drawn regardless of whether Hopkins read the text messages. Indeed, it is uncontroversial that statements can be used against a non-declarant where relevant. See, e.g., United States v. Nersesian, 824 F.2d 1294, 1325 (2d Cir. 1987) (noting that "declarations of intention or future plans are admissible against a nondeclarant when they are linked with independent evidence that corroborates the declaration").

Second, the text messages are not hearsay. To be hearsay, a statement must be introduced "to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c)(2). Thus, where "the statement is offered as circumstantial evidence of . . . state of mind, it does not fall within the definition given by Rule 801(c); because it was not offered to prove the truth of the matter asserted." United States v. Detrich, 865 F.2d 17, 21 (2d Cir. 1988). Here, Defendants are not seeking to use the text messages to prove the truth of the matters asserted. For example, the Defendants are indifferent as to whether Arhangelsky actually wanted Hopkins's bus to go

29

down. Instead, Defendants are offering the text messages as circumstantial evidence of Arhangelsky's state of mind. Therefore, the text messages are not hearsay.[14]

Third, the text messages and phone records may assist the jury in determining why Hopkins climbed aboard the train. The text messages offer circumstantial evidence of Hopkins's state of mind based on Arhangelsky's perceptions of Hopkins immediately before Hopkins went to the train station. True, this is not the best possible evidence of Hopkins's thought process, but it is nonetheless helpful.

Finally, the text messages and phone records are not unfairly prejudicial. Plaintiffs do not appear to argue that the phone records are unfairly prejudicial. Rather, all Plaintiffs argue is that the text messages are unfairly prejudicial because they contain foul language. (Id. at 4.) True, the text messages contain harsh language. However, that harsh language does not prejudice the Plaintiffs in any way. The messages were written by Arhangelsky, not Hopkins. Therefore, the court fails to see how the foul language could prejudice the jury against Plaintiffs. In any event, the harshness of the language—if prejudicial at all—does not substantially outweigh the probative value of the messages. Indeed, the harshness of the language in the text message offers strong evidence of Arhangelsky's contemporaneous reaction to Hopkins's actions. That is, the very fact that Arhangelsky used strong language in the text messages is itself probative of how Arhangelsky felt at the time.

Thus, the court finds that the text messages and phone records are admissible.

---

[14] Neither party offers a specific hearsay objection to the phone records. If Plaintiffs have a hearsay objection to the phone records, they can make it when Defendants move to have them admitted.

## 2.   Certain Newspaper and Facebook Evidence

### i.   Newspaper Article

Plaintiffs move to exclude a newspaper article entitled "Triple Amputee Inspires in White Plains," by Candice Ferrette. (Pls.' Mot. in Lim. to Preclude Various Hearsay Items (Dkt. 82) at 1.) The article states that Hopkins was injured "when an overhead wire broke loose and shocked him in a freak accident." (Defs.' Opp'n at 15.) Plaintiffs argue that the newspaper article is hearsay and therefore inadmissible. (Pls.' Mot. in Lim. to Preclude Various Hearsay Items at 1) Defendants respond that although "the article itself, if offered to prove that Hopkins made the statement in it, would be hearsay[,] [t]he article may be offered for other purposes." (Defs.' Opp'n at 15.) Specifically, Defendants argue that the undisputedly erroneous account of the incident in the article may be evidence that Hopkins felt compelled to conceal how the injuries occurred, which could infer consciousness of culpable conduct. (Id. at 15-16.)

Defendants are certainly correct that if Hopkins was the source of the error in the article then his decision to deceive would be circumstantial evidence of culpability. See United States v. Whitehead, 579 F. App'x 46, 48 (2d Cir. 2014) (summary order) (noting that a defendant's lie was circumstantial evidence of mens rea). However, Defendants have proffered no evidence that Hopkins was the source of the falsity. "When the relevance of evidence depends on whether a fact exists, proof must be introduced sufficient to support a finding that the fact does exist." Fed. R. Evid. 104. Accordingly, the court reserves on ruling on the admissibility of the article. If, in the unlikely event that, evidence is adduced that links Hopkins to the falsity, then the article could be admitted for the non-hearsay purpose that Defendants have proffered.

### ii.     Facebook Posts

Plaintiffs argue that Hopkins's Facebook page printouts likely contain inadmissible

hearsay. (Pls.' Mot. in Lim. to Preclude Various Hearsay Items at 2.)  Plaintiffs acknowledge

that Hopkins's own statements on his Facebook page are admissible as an opposing party

statement. (Id.)  Nonetheless, Plaintiffs argue that Facebook pages typically contain statements

of numerous people, many of which would be hearsay. (Id.)  Thus, Plaintiffs argue that any

admitted Facebook pages "should be carefully redacted."  Defendants appear to agree. (See

Defs.' Opp'n at 16.)  Accordingly, the court reserves ruling on the admissibility of any Facebook

posts.  If Defendants seek to use the Facebook posts, and redaction has not resolved the hearsay

problem, Plaintiffs may raise their hearsay challenge again.

### iii.     Hearsay within Hearsay

Finally, Plaintiffs argue that certain statements within police, fire, security company, and

ambulance reports should be excluded as hearsay. (Pls.' Mot. in Lim. to Preclude Various

Hearsay Items at 2.)  Defendants have not opposed. (Defs.' Opp'n at 1 n.1.)  Plaintiffs are

undoubtedly correct that "[i]nadmissible hearsay does not become admissible solely by virtue of

its inclusion in an admissible report."  Rodriguez v. Modern Handling Equip. of N.J., Inc., 604

F. Supp. 2d 612, 622 (S.D.N.Y. 2009).  However, Plaintiffs have not identified which specific

statements they find objectionable.  Accordingly, the court cannot determine whether any

hearsay exception applies to those statements.  Thus, the court reserves on determining whether

any statements within police, fire, security company, or ambulance reports should be excluded as

hearsay.

### 3. Dr. Morse's Knowledge of Capital Punishment

Plaintiffs move to preclude Defendants from inquiring into or referencing Dr. Morse's knowledge of capital punishment via the electric chair. (Pls.' Mot. in Limine to Preclude Electric Chair Evidence (Dkt. 81).) Defendants do not oppose the motion. (Defs.' Opp'n at 1 n.1.) The court agrees that inquiry into Dr. Morse's research of, and experience with, the electric chair would be significantly more prejudicial than probative. See Fed. R. Evid. 403. Thus, the court precludes Defendants from inquiring into, or referencing, Dr. Morse's knowledge of capital punishment via the electric chair.

### 4. Pleadings from Plaintiffs' State Case

Plaintiffs move to preclude pleadings from and reference to their dismissed state court case. (Pls.' Mot. in Lim. to Preclude State Case Pleadings (Dkt. 88).) Defendants do not oppose the motion. (Defs.' Opp'n at 1 n.1.) The court agrees that use of the state court pleadings or reference to the case being dismissed are likely to confuse the jury. See Fed. R. Evid. 403.

### B. Defendants' Motion

### 1. Expert Testimony

Defendants argue that "any opinions that Plaintiff's human factors expert Richard Gill ('Gill') reached by relying on the Klein/Birdwell incident should be precluded and Gill should be precluded from disclosing the facts of the Klein/Birdwell incident to the jury." (Defs.' Omnibus Mot. in Lim. ("Defs.' Mem.") (Dkt. 86) at 5.)

The court presumes familiarity with Gill's proffered testimony. (See generally Daubert Mem. & Order ("Daubert Decision") (Dkt. 73).) Briefly, Gill proposes to testify that:

> 1. The overall design and mode of operation of South Station, including the trains and power grid, created a life threatening functionally hidden hazard that presented an unreasonable risk of

harm to the general public in and around the platforms at South Station.

2. The reason that this functionally hidden hazard existed, as well as the reason it was not mitigated in a timely manner was the failure of the Defendants' safety and risk management programs; such failures were a callous and blatant disregard for public safety.

3. Mr. Hopkins [sic] actions and/or inactions were a relatively minor contributing factor to this incident.

(See Dec. 14, 2011, Rpt. of Richard Gill ("Gill Rpt.") (Pls.' Rule 26(A)(2) Disclosure of

Liability Expert Test. ("Pls.' Disclosure") (Dkt. 38), Ex. B (Dkt. 38-2)) at 1-2.)

For the reasons stated below, Gill will not be precluded from expressing his opinions, but

he will be precluded from disclosing the facts of the Klein/Birdwell incident to the jury.

<blockquote>

i.      Exclusion of Expert's Opinion Based on Reliance on Inadmissible Evidence

</blockquote>

Defendants argue that Gill should be precluded from testifying about any opinions that he

reached in reliance on the Klein/Birdwell incident because the court found the Klein/Birdwell

incident was inadmissible as direct evidence of notice. (Defs.' Mem. at 5.) The court disagrees.

First, the court already addressed this issue and ruled that Gill's opinions were

admissible. In its Daubert Decision, the court held:

> [U]nder Federal Rule of Evidence 703, Dr. Gill is permitted to rely on otherwise inadmissible evidence if it is the kind typically relied upon by experts in the field. Here, Defendants have not presented any evidence that an expert in the field would consider the Klein/Birdwell incident or any of the other excluded electrocutions so unrelated that they could not be considered in forming an opinion. The only evidence in the record is to the contrary. Dr. Gill's report concludes that the Klein/Birdwell incident is relevant for the purposes of reaching his opinions. (Gill Rpt. at 5.) Likewise, Mr. Bates considered other electrocutions relevant. (Bates Rpt. at 8-9.) Accordingly, the court does not find that Dr. Gill's report is unreliable. Moreover, an examination of Dr. Gill's report reveals that, although Dr. Gill notes where he relied on sources which were also relied upon in the Klein/Birdwell matter (see. e.g., Gill Rpt. at 4 (noting that the Amtrak Operating Instructions were '[a]nalyzed in the Birdwell and Klein incident')), he does not primarily base his opinions on the Birdwell/Klein

> incident. Therefore, even if the court were to exclude all reliance on the Klein/Birdwell matter, Dr. Gill would still have a sufficient factual basis to reach his opinions. Accordingly, the court will not exclude Dr. Gill's proffered report.

(<u>Daubert</u> Decision at 18.)

Under the law of the case doctrine, a court should generally adhere to its prior holdings absent "cogent" or "compelling" reasons militating in favor of reversal. <u>Johnson v. Holder</u>, 564 F.3d 95, 99 (2d Cir. 2009) (quoting <u>United State v. Quintieri</u>, 306 F.3d 1217, 1229 (2d Cir. 2002)). The major grounds justifying reconsideration are "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." <u>Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.</u>, 956 F.2d 1245, 1255 (2d Cir. 1992) (internal citation and quotation marks omitted); <u>see also</u> <u>United States v. Carr</u>, 557 F.3d 93, 102 (2d Cir. 2009).

Defendants have not offered a persuasive reason why the court should change course. Defendants have pointed to no new law. Indeed, the one case that Defendants cite in support of precluding Gill's opinions is a case from 1985, which this court cited in its original discussion finding Gill's opinions to be admissible. (<u>Compare</u> Defs.' Mem. at 7 (citing <u>In re Agent Orange Prod. Liab. Litig.</u>, 611 F. Supp. 1223, 1245 (E.D.N.Y. 1985), <u>with</u> <u>Daubert</u> Decision at 17 (also citing <u>In re Agent Orange Prod. Liab. Litig.</u>) Nor have Defendants pointed to any new evidence. In its <u>Daubert</u> Decision, the court indicated that Gill could rely on the Klein/Birdwell incident if a human factors expert would normally rely on an incident like the Klein/Birdwell incident in analyzing a case like this one. (<u>Daubert</u> Decision at 18.) The court then concluded, on the basis of the record before it, that human factors engineers would have relied on the Klein/Birdwell incident. (<u>Id.</u>) Defendants have not offered any evidence to change this view. Indeed, Defendants specifically indicate that they do not intend to provide any evidence about whether

an expert in the field of human factors engineering would rely on an incident like the Klein/Birdwell incident. (Defs.' Mem. at 7.) And finally, Defendants have not indicated that the court made a clear error of law or that a manifest injustice would arise from admitting Gill's testimony. Instead, Defendants simply mimic the arguments that they made in their <u>Daubert</u> briefing. (<u>Compare</u> Defs.' Mem. in Supp. of Mot. in Lim. to Preclude Liability Experts (Dkt. 69) at 18, <u>with</u> Defs.' Mem. at 7 (each arguing, without citation, that no reasonable expert would rely on the Klein/Birdwell incident).) Accordingly, the court sees no reason to revisit its <u>Daubert</u> holding.

But, even if the court were to reconsider its <u>Daubert</u> Decision, it would not change its opinion. Defendants argue that Gill should be precluded from testifying about any opinions that he reached in reliance on the Klein/Birdwell incident because the court found the Klein/Birdwell incident inadmissible as direct evidence of notice. (Defs.' Mem. at 5.) Specifically, Defendants argue that because the Klein/Birdwell was excluded to show direct evidence of notice, it must be "so lacking in probative force and reliability that no reasonable expert could base its opinion on" it. (<u>Id.</u> (quoting <u>In re Agent Orange Prod. Liab. Litig.</u>, 611 F. Supp. at 1245). This argument misconstrues the basis for excluding the Klein/Birdwell incident. The court did not hold, and does not believe, that the Klein/Birdwell incident has no probative value. Instead, the court found that admission of the Klein/Birdwell incident would on balance be more prejudicial than probative.

In its Summary Judgment Decision, the court explained that when a prior accident is offered to show notice of a dangerous condition, the prior accident must be substantially similar to the case at issue. (Summary Judgment Decision at 19.) In support of this conclusion, the court cited two cases: <u>Edwards v. Consol. Rail Corp.</u>, 567 F. Supp. 1087 (D.D.C. 1983) and

McKinnon v. Skil Corp., 638 F. 2d 270 (1st Cir. 1981). (Id.) Both Edwards and McKinnon

explain that the "substantial similarity" rule is grounded in a balance between probative value

and a risk of unfair prejudice. For example, the Edwards court stated:

> The rationale for excluding evidence of prior accidents that happened under dissimilar or remote circumstances is a matter of logic: as time and circumstances become less similar to the accident under consideration, the probative value of the occurrence of such prior accidents decreases, while the prejudicial value of such evidence before a jury remains high. The value of such evidence is that, when prior accidents have occurred under similar circumstances, the accidents and knowledge of them operate as a standard against which can be tested the reasonableness of the defendant's conduct. But such evidence should be carefully examined before being received to the end that the circumstances of the other accident bear similarity to the circumstances surrounding the accident at issue. This is because such evidence can be unfairly prejudicial; the jury might infer from evidence of the prior accident alone that ultra-hazardous conditions existed at the site and were the cause of the later accident without those issues ever having been proved.

567 F. Supp. at 1106 (internal quotation marks, citations, emphasis, and alteration removed).

Likewise, McKinnon, grounded the "substantial similarity rule" in the First Circuit's opinion in

P. B. Mutrie Motor Transp., Inc. v. Inter-Chem. Corp., 378 F.2d 447, 450 (1st Cir. 1967), see

McKinnon, 638 F.2d at 277, and Mutrie derived the "substantial similarity rule," in part from the

risk of unfairness, Mutrie, 378 F.2d at 450-51 ("We think this case lies within the scope of the

reservation that where substantial identity in the circumstances appears, and the danger of

unfairness, confusion or undue expenditure of time in the trial of collateral issues reasonably

seems small to the trial judge, he has generally been left free to admit such evidence in his

discretion." (internal citation and quotation marks omitted)). Thus, the "substantial similarity"

requirement is not based solely on relevance, but instead incorporates a balance between

probative force and unfair prejudice. See, e.g., Surles ex rel. Johnson v. Greyhound Lines,

Inc., 474 F.3d 288, 297 (6th Cir. 2007) (explaining that the "substantially similar" rule exists "in

large part because all evidence deemed admissible by the district court must meet the minimal standards of relevancy articulated in Federal Rules of Evidence 401 and 403").

This makes sense. The fact that somewhat (although not substantially) similar accidents have occurred does tend to make it more likely that a defendant was aware of the risks in question. Nonetheless, admitting such tangentially related prior accidents strongly prejudices the defendant because a jury is likely to infer that because the defendant had engaged in dangerous conduct in the past, they engaged in dangerous conduct in the present. These concerns, however, are not implicated when an expert relies on somewhat similar accidents. As Defendants acknowledge, "the expert is assumed, if he meets the test of Rule 702, to have the skill to properly evaluate the inadmissible evidence, giving it probative force appropriate to the circumstances." (Defs.' Mem. at 7 (internal quotation marks, citation, and alterations removed).)

As the court explained in its Daubert Decision, this balancing between the weights assigned to various pieces of evidence is precisely what Gill appears to have done in his expert report. (Daubert Decision at 18 ("Moreover, an examination of Dr. Gill's report reveals that, although Dr. Gill notes where he relied on sources which were also relied upon in the Klein/Birdwell matter, he does not primarily base his opinions on the Birdwell/Klein incident.").) Defendants may disagree with the weight that Gill assigns to various pieces of evidence, or the conclusions that Gill draws from that evidence, but Defendants have not put forward a valid basis to exclude Gill's testimony.

Thus, the court finds that Gill is permitted to offer his opinions to the extent authorized by the Daubert Decision.

ii.    Disclosure of Otherwise Inadmissible Evidence

In the alternative, Defendants argue that Gill "should be precluded from disclosing the facts of the Klein/Birdwell incident to the jury." (Defs.' Mem. at 5.) Defendants argue that "the facts of the Klein/Birdwell incident will not aid the jury in evaluating the credibility of Gill's opinions, yet they could have a highly prejudicial effect." (Id. at 8.) Plaintiffs argue that under Rule 703, experts are permitted to rely on inadmissible evidence. (Pls.' Opp'n (Dkt. 92) at 2.) Plaintiffs, however, do not offer a specific reason why Gill should be permitted to disclose the facts of the Klein/Birdwell incident to the jury.

Federal Rule of Evidence 703 provides:

> An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.

Fed. R. Evid. 703 (emphasis added). As the court explained above, admission of prior accidents to show notice risks significant prejudice to defendants if the prior accidents are not substantially similar to the facts in the case at issue. In the Summary Judgment Decision, the court accordingly found that admission of the Klein/Birdwell incident would be prejudicial to Defendants. (Summary Judgment Decision at 19.) Plaintiffs have not presented any reason why the jury would be assisted at all by the disclosure of the facts of the Klein/Birdwell incident, much less, why that assistance would substantially outweigh the prejudice to Defendants. Thus, the court finds that Gill shall be precluded from disclosing the facts of the Klein/Birdwell incident to the jury.

## 2. Benji Incident[15]

Defendants next argue that the court should reconsider the admissibility of the Benji Incident. In its Summary Judgment Decision, the court found that the Benji Incident was admissible as direct evidence of notice because "in the Ben[j]i incident an individual was injured after standing atop an Amtrak train in Penn Station in New York and coming into contact with a catenary wire. The court concludes, based on the information presented, that this incident is similar enough in nature to the instant case to serve as notice that members of the public might move from the platforms onto trains parked in stations." (Summary Judgment Decision at 20.) Defendants now argue that the court should reconsider the admissibility of the Benji Incident "in light of the Court's Daubert ruling." (Defs.' Mem. at 8.) Specifically, Defendants contend that although the Benji incident may have been relevant at the Summary Judgment phase where Plaintiffs' liability theory included allegations that Defendants were reckless because they parked their trains at the station overnight and did not de-energize the overhead catenary wires, it is no longer relevant because the court's Daubert Decision precluded the Plaintiff from offering expert testimony regarding the feasibility of parking the train elsewhere or de-energizing the wire. (Id. at 10-11.) The court disagrees; the Benji Incident remains admissible to show notice.

First, the Daubert Decision has not meaningfully changed the landscape. The court never precluded Plaintiffs from offering evidence that it was feasible to de-energize the catenary wire or to park the trains elsewhere. Instead, all the court held was that Gill and Rogers could not testify that it would have been feasible to do so. (Daubert Decision at 12-13, 30-31.) Indeed, the court was clear that Plaintiffs could pursue other methods of showing the feasibility of de-

---

[15] In their 56.1 statement, Plaintiffs referred to this incident as the Bengi Incident. (Pl.'s 56.1 Stmt. (Dkt. 49) ¶ 50.) In the Joint Pre-Trial Order and Motions in Limine, the parties refer to the incident and the Benji Incident. (See, e.g., Joint Pre-Trial Order ("JPTO") (Dkt. 75) at 49.) The court assumes the earlier spelling was an error and refers to the incident as the Benji incident.

energizing the catenary wire or parking the trains elsewhere, and if they did so, could offer expert testimony on how those alternative designs would have made South Station safer. (Id. at 13 n.6 ("To be clear, Dr. Gill himself may not testify that it would have been feasible to de-energize the catenary wires or store the trains elsewhere. However, whether Dr. Gill is ultimately permitted to opine on whether de-energizing catenary wires and storing trains elsewhere would have made South Station safer is a question of conditional relevancy; his views that such measures would make South Station safer will only be admissible if facts showing feasibility are adduced through other witnesses at trial."). Plaintiffs appear to be pursuing exactly this line of proof. For example, Plaintiffs have designated page 97, lines 10 through 16 of Robert Verhelle's deposition for use at trial. (Joint Pre-Trial Order ("JPTO") (Dkt. 75) at 40.)[16] Those lines concern Verhelle's testimony that it was technically feasible to de-energize the overhead catenary wires. (See Verhelle Dep. (Decl. of Russell X. Pollock in Opp'n to Defs.' Mot. for Summ. J. (Dkt. 47), Ex. 3 (Dkt. 47-1)) at 97:13-17 ("As far as feasible, can it be done? It can be done. Again, it's not a normal way to operate electric traction power.").) Thus, Plaintiffs were permitted to pursue, and appear to be pursuing, the same liability theory that Defendants acknowledge made the Benji Incident relevant at the Summary Judgment phase.

Second, Defendants' attempt to re-litigate whether the facts of the Benji Incident are substantially similar to this case is unpersuasive. Defendants argue that the Benji Incident should be excluded because (1) the Benji accident occurred 14 years prior to this incident, (2) the Benji Incident "may not have occurred at a platform," and (3) the Benji Incident occurred on top of a locomotive engine, not a passenger car. (Defs.' Opp'n at 16.) None of these reasons

---

[16] The parties have not briefed the question, and therefore, the court does not provide an opinion on whether this deposition section would be admissible at trial.

challenges the court's core finding in the Summary Judgment Decision that the Benji Incident is substantially similar to the incident here because it too involves an individual who came into contact with an overhead catenary wire by climbing a train car, which was parked in a station. (Summary Judgment Decision at 20.) Defendants have presented no argument why that core ruling should be disturbed; therefore, the court reiterates that the Benji Incident is admissible.

i.      Reconsideration of Other Incidents

Plaintiffs argue that Defendants have opened the door to re-argument of whether other incidents are sufficiently similar to this case to allow their admission to prove notice. (Pls.' Opp'n at 2-6.) Even if the court were to reconsider the admissibility of other incidents, it would not change its views.

At the summary judgment phase, Plaintiffs argued that six previous incidents where individuals climbed on top of trains and came into contact with electrical wires were relevant to show notice. (Summary Judgment Decision at 18.) The court found that only incidents that occurred at train stations were sufficiently similar to this case to be admissible. (Id. at 20.) Specifically, the court found that:

> It is a different matter to have notice that individuals might be injured when they climb on trains in a rail yard or freight yard than it is to have notice that individuals might be injured when they climb on a waiting train in a public station. Indeed, Plaintiffs argue that Defendants' misconduct involved disregarding the risk that individuals in the station would not appreciate the danger of the electrified wire, and thus failing to put up signs, close the platform, or have more security in the station. Accordingly, notice of prior incidents where the risk involved leaving trains under electrified wires in a rail yard or freight yard, where the notice and security at issue would likely be very different than that of an enclosed public station, is not relevant.

(Id. (internal citations omitted).) Plaintiffs have not pointed to any persuasive reason why this determination was erroneous. "A court's reconsideration of its own earlier decision in a case

42

may, however, be justified in compelling circumstances, consisting principally of (1) an intervening change in controlling law, (2) new evidence, or (3) the need to correct a clear error of law or to prevent manifest injustice." Carr, 557 F.3d at 102.

First, Plaintiffs have not argued that there has been an intervening change in law. Indeed, Plaintiffs suggest that the court applied the correct legal standard in its Summary Judgment Decision. (Compare Pls.' Opp'n at 3 (stating that prior incidents are admissible to show notice when the conditions surrounding the prior incident are substantially similar to the accident that is at issue), with Summary Judgment Decision at 19 (same).)

Second, Plaintiffs have not produced any meaningful new evidence. Indeed, Plaintiffs do not argue that new evidence warrants a different result.

Finally, Plaintiffs do not suggest that the court made a clear error of law or that manifest injustice will result from a failure to reconsider. Instead, Plaintiffs argue that the court should admit all prior instances of electric shocks on top of trains for two reasons. Preliminarily, Plaintiffs argue that all of the proffered accidents are substantially similar because in each case the same hazard caused the harm (namely, an overhead catenary wire). (Pls.' Opp'n at 5.) This argument entirely ignores case law such as Edwards, which holds that even where all the proffered incidents involve electric shocks by overhead catenary wires, the specific location remains important to determine whether two incidents are substantially similar. See Edwards, 567 F. Supp. at 1106-07. This rule makes sense, railway operations run across diverse terrain. Therefore, railway operators are, and should be, expected to take different safety precautions depending on the specific risks posed at the various locations at which they work. For example, an overhead catenary wire that is installed in a very difficult to reach rural location may post different safety risks—and therefore, pose a different hazard—than the same overhead

43

catenary wire along a commonly trafficked road. Cf. Gardner, 675 F.2d at 952 (noting that in a case concerning unsafe train operation at a crossing, the court must carefully consider the conditions at the crossing at the time of a proffered previous accident). Perhaps recognizing that the mere fact that each of their proffered prior accidents involved overhead catenary wires is insufficient, Plaintiffs argue that rural incidents (such as the Klein/Birdwell Incident) should be admissible in this case because "[w]hen the same Amtrak hazard that caused the injury in the Birdwell case is placed in a more crowded urban area such as Boston and is further located in a major Amtrak downtown city station with high foot traffic and elevated boarding platforms open to the public 24 hours per day, such as MBTA's South Station, an accident similar to Birdwell is even more foreseeable." (Pls.' Opp'n at 5.) This is the very type of flawed, inferential, and prejudicial reasoning that the "substantially similar" rule seeks to avoid. Edwards speaks clearly to this point. It noted "any notice that defendant may have had regarding [individuals] who had previously climbed on top of trains standing in storage yards at other areas in the District of Columbia located near houses or museums with no fences or other natural bars to access to the tracks is not relevant to defendant's knowledge or realization of the likelihood that [individuals] would be injured by a catenary wire at the site of plaintiff's accident." Edwards, 567 F. Supp. at 1107. The court agrees with Edwards, Plaintiffs cannot infer notice from prior accidents at materially different locations.

Thus, the court will not reconsider its prior holding that only accidents that occurred in stations are substantially similar to Hopkins's accident.

### 3. Other Dissimilar Incidents

Defendants argue that other dissimilar incidents are inadmissible to show notice. (Defs.' Mem. at 11-12.) Specifically, Defendants move to exclude admission of, and testimony

44

regarding, Plaintiffs' proposed Exhibit 54, which is a list of criminal activity occurring at South Station and Plaintiffs' proposed Exhibit 87, which is a list of incidents involving electrical injuries suffered by trespassers onto Amtrak property. (Id.) Plaintiffs respond that they do not intend to introduce Exhibits 54 or 87. (Pls.' Opp'n at 6.)

Instead, Plaintiffs argue that Exhibits 54 and 87 can form the basis for their expert's opinions under Rule 703. Defendants do not appear to challenge whether an expert could rely on Exhibits 54 or 87. Absent some specific argument from Defendants about the reliability of expert opinions formed on the basis of Exhibits 54 or 87, the court will not revisit its Daubert Decision.

Likewise, although Plaintiffs' statement that Rule 703 allows for an expert to disclose inadmissible information when the probative value of the evidence substantially outweighs its prejudicial effect (Pls. Opp'n at 7), is correct, Plaintiffs do not indicate whether they intend for their experts to disclose Exhibits 54 or 87, and if so, why they believe such disclosure would assist the jury.

Thus, at this stage, the court rules only that Exhibits 54 and 87 are inadmissible, but that Plaintiffs' experts can rely on them. The court defers on ruling whether Plaintiffs' expert can disclose Exhibits 54 and 87.

### 4. Local Agency Investigation Reports

Defendants request that reports regarding the accident written by Boston Emergency Medical Services, the Boston Police Department, the Boston Fire Department, and Allied-Barton Security Services should be excluded. (Defs.' Mem. at 12-13.) Defendants argue that all such reports are irrelevant because they were written by witnesses who arrived after Hopkins suffered

his injuries, and because information regarding security at South Station or Hopkins's damages can be presented through other witnesses. (Id.)

The court disagrees. First, the fact that the reports were authored by witnesses who arrived after the incident is unimportant. The reports, many of which describe the conditions at South Station or Hopkins's injuries immediately after the incident, are relevant. For example, the Boston Police Department's July 9, 2006, Report indicates that the overhead catenary wire at South Station is live at most times, that the train upon which the accident occurred arrived at South Station from the Southampton Street Yard between 11:41 and 11:45 p.m. the previous night, that the train had been parked at South Station all night, and that the train was expected to leave for New York City at 11 a.m. in the morning. (Pls.' Proffered Ex. 7 (on file with court).) This types of information is relevant to Plaintiffs' claim that South Station was unreasonably unsafe. Likewise, the Boston Emergency Medical Services Patient Care Report describes Hopkins's initial injuries, responsiveness to medical professionals immediately following the incident, and initial treatment. (Pls.' Proffered Ex. 33 (on file with court).) This type of evidence is relevant to show the extent of Hopkins's injuries and therefore his damages. True, the reports are not the best possible evidence; they do not provide first-hand accounts of South Station at the moment that Hopkins was injured. But, the Federal Rules of Evidence do not bar all except the best possible evidence. See Fed. R. Evid. 401, 402. Thus, the court concludes that the reports are relevant.[17]

Second, the fact that other witnesses may be able to testify to the content of the reports is inconsequential. The court interprets Defendants' argument as a cumulativeness challenge.

---

[17] The court notes that Defendants have not raised a hearsay or authenticity challenge to the reports. Therefore, the court does not address whether the reports are admissible as non-hearsay or under a hearsay exception, or whether the reports are properly authenticated.

"Evidence is cumulative when it replicates other admitted evidence." Jamil, 707 F.2d at 643. It is possible that evidence of the safety measures at South Station or Hopkins's injuries could become cumulative. However, the court cannot make such a determination until it observes what evidence Plaintiffs introduce at trial.

Thus, the court rules that the proffered reports regarding the accident written by Boston Emergency Medical Services, the Boston Police Department, the Boston Fire Department, and Allied-Barton Security Services are relevant. Should Defendants believe that the reports are otherwise inadmissible or cumulative, they should raise their objections at trial.

### 5. Railroad Safety Manuals and Industry Literature

Defendants seek to exclude "various operating and safety manuals, guidelines, instructions videos, and other training material intended for railroad employees or contractors" as well as the "National Fire Protection Association Manual and the National Electrical Safety Code ('NESC')" from being introduced as evidence. (Defs.' Mem. at 13.) Defendants reason that (1) the court held in its Daubert Decision that Plaintiffs' expert electrician James Rogers could not opine on what safety measures the NESC requires; (2) the documents are irrelevant because Defendants do not dispute that catenary wires are dangerous, can cause injuries like those that Hopkins suffered, and can cause such injuries by arcing; and (3) the documents do not concern trespassers and therefore risk prejudicing Defendants. Plaintiffs respond that the materials are relevant to show that Defendants understood the risks associated with catenary wires and further understood that those risks were not "immediately apparent" to the public. (Pls.' Opp'n at 7-8.) Plaintiffs are largely correct.

First, the fact that Rogers cannot testify as to what the NESC requires does not render the NESC wholly irrelevant. Rather, the court based its Daubert Decision on the twin findings that

47

Rogers was not qualified to opine on train station safety and that, in any event, Rogers did not have a reliable methodology for determining what safety measures are required in a train station. (Daubert Decision at 30-32.) Based on these findings, the court held that Rogers could not opine on what NESC required of Defendants. (Id. at 33.) However, the court was clear that it did not need to decide whether the NESC rules were binding on Defendants and therefore did not need to decide the general question of whether NESC rules are relevant. (Id. at 33.)

Second, both industry literature and the NESC rules provide relevant information beyond the facts that Defendants do not contest (that catenary wires are dangerous, can cause injuries like those Hopkins suffered, and can cause such injuries by arcing). Specifically, Plaintiffs argue that the proffered industry literature and the NESC rules both evidence Defendants' knowledge of the risks associated with overhead catenary wires and provide circumstantial evidence that the general public does not understand the risks associated with catenary wires. The court agrees, the fact that Amtrak, other railroads, and the electrical standards see fit to repeatedly remind trained workers of the risks associated with catenary wires does provide some circumstantial evidence that the wires are highly dangerous and that individuals often do not fully comprehend the risks associate with overhead catenary wires.[18]

Finally, the court does not believe that Defendants will suffer undue prejudice from admission of industry literature and the NESC rules. Defendants claim that they will suffer prejudice because the jury may "render a verdict based on hazards arising from completely distinct and unrelated situations, such as employees performing authorized work on electrical lines or based solely on the general dangers of electricity without regard to the specific

---

[18] The court notes that much of the proffered industry documents are not relevant. Although either Plaintiffs or Defendants may have a good reason to admit the full documents, the court encourages the parties to consider submitting only relevant subsections to the jury.

circumstances unique to this case." (Defs.' Mem. at 14.) The court does not believe this is likely. The documents which Plaintiffs have proffered indicate on their face the context for which they are intended. Defendants are free to highlight to the jury that the documents largely relate to employees performing authorized work and certainly do not provide safety standards for trespassers. Moreover, the jury will receive a lengthy instruction on what Plaintiffs must prove to demonstrate recklessness under Massachusetts law. The court is confident that this instruction will focus the jury on the specifics of this case and prevent the jury from finding liability based on inapplicable standards. United States v. Dupree, 706 F.3d 131, 138 (2d Cir. 2013) ("A court should consider the possible effectiveness of a jury instruction . . . in making a Rule 403 determination.").

Thus, the court finds the proffered industry literature and the NESC rules admissible. However, the court notes that neither party has addressed the specific content of any of the literature. Should a party have any specific objections to an individual subsection or sections of a document, they should raise their objections at trial.

### 6. Government Reports and Literature

Defendants argue that Plaintiffs' proffered Exhibits 88 through 103, which consist of various government reports concerning "general railway safety issues . . . as well as specific incident reports" should be excluded. (Defs.' Mem. at 14.) Defendants argue that none of the incidents in the reports are substantially similar to the incident at issue here and thus should be excluded. (Id. at 14.) Plaintiffs respond that the documents are relevant "to the magnitude of the danger, railway safety and whether Defendants should have prevented this incident." (Pls.' Opp'n at 8.)

Neither party has mentioned any specifics about the proffered documents nor described, in any detail, their views on why the documents are admissible or inadmissible. Moreover, the court's independent review of the documents demonstrated that they varied wildly in terms of content. For example, Plaintiffs' proffered Exhibit 89 is a National Transportation Safety Board safety recommendation following a 1971 electrocution of a man on top of a freight car. (Pls.' Proffered Ex. 89 (on file with court).) The document discusses a single accident and suggests ways to improve railroad safety. (Id.) By contrast, Plaintiffs' proffered Exhibit 90 is a 239-page report entitled "Safety Considerations with Railroad Electrification: A Preliminary Review and Assessment." (Pls.' Proffered Ex. 90 (on file with court).) The document engages in a broad review of the hazards associated with electrified railroad systems and the means for mitigating those hazards. (Id.) The vast differences between the proffered documents plainly requires different evidentiary analysis—analysis neither party has even attempted.

Therefore, the court reserves ruling on the admissibility of proffered Exhibits 88 through 103. Should Defendants have any specific objections to a document, they should raise those objections either at or before trial.

### 7.    Contracts Regarding South Station

Defendants move to exclude various contract documents concerning the use and operation of South Station because the parties have stipulated that the MBTA owns and operates South Station and that Amtrak operates and maintains the catenary system. (Defs.' Mem. at 15.) Plaintiffs respond that in light of the parties' stipulation, admission of the contract documents are "likely unnecessary." (Pls.' Mem. at 8.)

The court therefore does not currently need to decide whether the contract documents are admissible. Should Plaintiffs decide that such documents are necessary, the court will then consider Defendants' motion.

### 8. Day in the Life Video and Before and After Photographs

Defendants move to exclude a "day in the life" video of Hopkins, as well as certain photographs showing Hopkins before and after his injury. (Defs.' Mem. at 15-16.) The court does not have access to the Plaintiffs' proffered "day in the life" video at this time. Moreover, given the court's decision to bifurcate the damages and liability phases of trial, the court need not currently decide this issue. Therefore, the court reserves ruling on this issue.

Plaintiffs are instructed to provide the court with a copy of the "day in the life" video as well as the photographs they intend to introduce by Monday, May 9, 2016.

### 9. Morse at the Liability Phase

Finally, Defendants argue that Dr. Morse ("Morse") should be precluded from testifying at the liability phase of trial. (See generally Defs.' Mot. in Lim. to Preclude Testimony of Michael Morse from the Liability Phase of Trial (Dkt. 99).) Defendants argue that Morse's testimony should be precluded because "there is no genuine factual dispute regarding the only portion of his testimony that is relevant to liability, i.e., that contact with the catenary wire posed a risk of substantial physical harm or death." (Defs.' Mem. in Supp. of Mot. in Lim. to Preclude Testimony of Michael Morse from the Liability Phase of Trial ("Defs.' Morse Mem.") (Dkt. 101) at 7.) Plaintiffs respond that Morse will be called to address the following liability issues:

> This is considered a high voltage incident given the magnitude of voltage involved; The phenomenon of arcing of electricity; It is likely that Brian Hopkins never actually contacted the high voltage wire; The electricity arced from the wire to Brian Hopkins; The

51

> entry wound was likely his left hand or forearm; The exit wound
> was likely his left foot; and Related relevant opinions.

(Pls.' Mem. in Opp'n to Defs.' Mot. to Preclude Testimony of Michael Morse from the Liability Phase of Trial ("Pls.' Morse Opp'n") (Dkt. 106) at 1-2.)

Defendants respond that they have offered to stipulate to the fact that contact with a catenary wire risks a substantial physical injury or death (Defs.' Morse Mem. at 5-6), and to the fact that this is a high voltage incident, that Hopkins may have never touched the wire, that Hopkins was roughly a centimeter from the wire when the arc was drawn, and to the probable entry and exit wounds (Defs' Reply in Further Supp. of Mot. in Lim. to Preclude Testimony of Michael Morse from the Liability Phase of Trial ("Defs.' Reply") (Dkt. 107) at 2). Thus, Defendants reason that, in light of their proposed stipulation, there is no liability evidence for Morse to add. (Id. at 7.) In addition, Defendants argue that any liability evidence that Morse could offer would be cumulative or prejudicial damages evidence. (Id. at 7-8.)

The court finds that Morse has relevant liability opinions. Indeed, in its Daubert Decision, the court noted that "the gravity of the risk posed by a live catenary wire is relevant to liability because a finding of recklessness under Massachusetts law requires an [] easily perceptible danger of death or substantial physical harm." (Daubert Decision at 35.) Morse proffered opinion speaks to the risk of harm posed by catenary wires. Moreover, Morse's testimony is not redundant of the stipulation. A stipulation that contact with catenary wires can cause grave injury or death will not explain to the jury what cause means (that is, how a live wire causes harm), or what grave injury means (that is, the specific harm that live catenary wires can cause). (See generally Pls.' Reply in Opp'n to Defs.' Mot. to Preclude Testimony of Michael Morse from the Liability Phase of Trial (Dkt. 108) at 1-2.) Each of these issues speaks to the gravity of the risk posed by a catenary wire.

Indeed, even if a stipulation could offer the jury an equal understanding to Morse's proffered testimony, the usual rule is that parties are free to offer live testimony in lieu of a stipulation. See Old Chief, 519 U.S. at 189. Additionally, the court doubts that a stipulation will offer the jury the same understanding as Morse's testimony would. For example, Morse proposes to explain how an electric wire can cause a shock through arcing—that is, without direct contact with the wire. Arcing is not necessarily an intuitive concept. Thus, the court believes that the jury will benefit from Morse's live testimony.

In addition, Morse's testimony is not cumulative. True, multiple witnesses will testify that a live catenary wire poses a grave risk. However, Morse, as an electrical engineer, can offer perspectives on the specific risk posed by high voltage energy. Moreover, to the extent that Plaintiffs' testimony becomes cumulative, the court can always halt lines of questioning at trial.

Finally, Morse's testimony will not be prejudicial. Defendants only argument for prejudice is that Morse will present damages evidence at the liability phase. (Defs.' Morse Mem. at 7.) He will not be permitted to. Plaintiffs are instructed to carefully question Morse to ensure that he does not delve into the specifics of Hopkins's injuries. To the extent Morse is asked about Hopkins's specific injuries, the court will not permit an answer at the liability phase.

Thus, the court concludes that Morse may testify to his liability opinions at the liability phase.

## IV. CONCLUSION

For the reasons stated above the court finds that:

- Plaintiffs' motion to preclude electric chair evidence (Dkt. 81) is GRANTED. (See supra Part III.A.3.)

- The court RESERVES ruling on Plaintiffs' motion to preclude various hearsay items (Dkt. 82). (See supra Part III.A.2.)

- Plaintiffs' motion to exclude evidence of Hopkins's comparative negligence (Dkt. 83) is GRANTED in part and DENIED in part. (See supra Part III.A.1.ii.a.) Specifically, Defendants will be permitted to offer evidence of Hopkins's drunkenness on the night of the accident (see supra Part III.A.1.ii.a.i), Hopkins sneaking past a security guard at a bar (see supra Part III.A.1.ii.a.iii), and Hopkins storming out of his friend's home at 4 a.m (see supra Part III.A.1.ii.a.iv). Defendants are not permitted to offer evidence that Hopkins urinated in public on the night of the accident. (See supra Part III.A.1.ii.a.ii.)

- Defendants' omnibus motion (Dkt. 84) is GRANTED in part, DENIED in part, and RESERVED in part. (See supra Part III.B.) Specifically, Gill is permitted to offer his opinions based on the Klein/Birdwell Incident to the jury (see supra Part III.B.1.i), and Plaintiffs are permitted to introduce the Benji Incident (see supra Part III.B.2), local agency investigation reports, subject to objection at trial (see supra Part III.B.4), railroad safety manuals and industry literature, subject to objection at trial (see supra Part III.B.5), and Morse's opinions at the liability phase (see supra Part III.B.9) to the jury. Plaintiffs are not permitted to disclose the facts of the Klein/Birdwell Incident to the jury (see supra Part III.B.1.ii), nor are Plaintiffs permitted to introduce Exhibits 54 and 87 (see supra Part.III.B.3), or contracts regarding South Station to the jury (see supra Part.III.B.7). Finally, the court reserves ruling on the admissibility of various government reports and literature (see supra Part.III.B.6) and the "day in the life video" and before and after photographs (see supra Part.III.B.8).

- Plaintiffs' request to reconsider the admissibility of other prior incidents (Dkt. 92) is DENIED. (See supra Part.III.B.2.i.)

- Plaintiffs' motion to exclude evidence concerning Hopkins's knowledge of electrical danger (Dkt. 87) is DENIED. (See supra Part III.A.1.ii.b.)

- Plaintiffs' motion to preclude state case pleadings (Dkt. 88) is GRANTED. (See supra Part III.A.4.)

- Plaintiffs' motion to exclude evidence of Hopkins's drinking and marijuana use (Dkt. 89) is GRANTED in part and DENIED in part. (See supra Part III.A.1.ii.c.)

Specifically, evidence of Hopkins's prior drinking is admissible but evidence of Hopkins prior marijuana use is not.

- Plaintiffs' motion to exclude text messages and phone records (Dkt. 90) is DENIED. (See supra Part III.A.1.ii.d.)

- Defendants' motion to preclude testimony of Michael Morse from the liability phase of trial (Dkt. 99) is DENIED. (See supra Part III.B.9.)

SO ORDERED.

s/Nicholas G. Garaufis

Dated: Brooklyn, New York
     April 29 2016

NICHOLAS G. GARAUFIS
United States District Judge